**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| In re: Arby's Restaurant Group, Inc. Data Security Litigation | Case No. 1:17-cv-1035-WMR |
| CONSOLIDATED CONSUMER CASE | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED
MOTION FOR FINAL APPROVAL OF SETTLEMENT AND
CERTIFICATION OF SETTLEMENT CLASS**

## I.   INTRODUCTION

On November 30, 2018, the Court granted preliminary approval of the proposed Settlement Agreement (hereinafter "Settlement")[1] between the Consumer Plaintiffs ("Plaintiffs") and Arby's Restaurant Group ("Arby's") (collectively, the "Parties") in this case.  (ECF No. 177)[2].  By that same Order, the Court adopted the proposed Notice Program.  *Id*.  The Parties complied with the Court's Order and provided the Class with notification as set forth in the declaration of Carla Peak, attached as Exhibit 1.  Not a single Settlement Class Member objected to or opted

---

[1] Unless otherwise defined, capitalized terms used herein have the same meaning as defined in the settlement agreement, *see* ECF No. 169-2, and the Amendment to Settlement Agreement. *See* ECF No. 175-1 (together, the "Settlement Agt.").

[2] All docket references are to the Consolidated Consumer Docket, No. 1:17-cv-1035-WMR.

out of the settlement. Plaintiffs now move the Court for final approval of the settlement and for certification of the Settlement Class.

## II.    RELEVANT BACKGROUND

### A. The Data Breach

Plaintiffs brought this class action seeking redress for Arby's alleged failures to safeguard customers' payment card data that Arby's collected at the point-of-sale ("POS") systems. Arby's has acknowledged that customers who used payment cards for transactions at over 950 Arby's corporate-owned restaurants located throughout the United States may have had their payment card data exposed during varying time frames for each location between October 8, 2016 and through January 12, 2017, based on the presence of "malware" on the POS systems at those locations (the "Data Breach"). Plaintiffs claim that, through this malware, intruders were able to access and exfiltrate data from the payment cards used in those customer transactions.[3]

### B. Procedural History

After Arby's announced the Data Breach, Arby's customers filed a pair of class action lawsuits alleging that Arby's failed to implement adequate measures to protect their customer data. Financial institutions also filed suit against Arby's

---

[3] The Data Breach is referred to in the Settlement Agreement as the "Security Incident."

relating to the Data Breach.  The Court consolidated the two customer class action cases into a single "Consumer Case," and consolidated the financial institution cases into a separate single "Financial Institution Case."  (ECF No. 25).  The Court also appointed separate leadership for the Consumer and Financial Institution Cases. (EFC No. 48).

Plaintiffs filed their Consolidated Class Action Complaint on July 21, 2017 ("Complaint") (ECF No. 47).   The Complaint included five Named Plaintiffs ("Plaintiffs") who alleged that their data was compromised in the breach and who sought to assert common law and state consumer protection claims on behalf of themselves and, on a number of the counts, all Arby's customers in the United States who were similarly situated.

Arby's moved to dismiss the claims on August 24, 2017 (ECF No. 52). The Court denied that motion on March 5, 2018, except for the claims for violations of the Georgia Fair Business Practices Act ("GFBPA") and other state consumer laws. (ECF No. 102).  Plaintiffs subsequently amended their Complaint to replead those claims (ECF No. 107), and Arby's filed a second motion to dismiss (ECF No. 117). On June 28, 2017, the Court entered an order denying Arby's motion to dismiss the GFBPA claim, and dismissing the other state consumer law claims as redundant. (ECF No. 146).

Separately, the Parties negotiated a preliminary scheduling order (ECF No. 32), which directed the Parties to begin meeting and conferring regarding further case management orders. *Id.* Along with the Financial Institution Plaintiffs, the Parties negotiated a protocol for the production of documents and ESI (ECF No. 85), an expert discovery protocol (ECF No. 99), and a confidentiality agreement and protective order. (ECF No. 96). The Parties submitted and argued competing discovery proposals regarding the length, timeline, and amount of discovery, resulting in the Court's Scheduling Order and Order Regarding Discovery Plan and Deposition Protocol. (ECF No. 85). Throughout the course of the litigation, the Parties held numerous conferences to negotiate the scope of their requests, ESI, and Arby's document custodians. The Parties continued to address unresolved disputes in periodic status conferences before the Court.

The Parties had begun exchanging written discovery at the time of settlement. Plaintiffs and Arby's had exchanged interrogatory responses. (ECF Nos. 70; 98; 100; 122; 123; 127; 130; 141; 149). Additionally, Consumer and Financial Institution Plaintiffs jointly propounded 62 document production requests on Arby's. With the help of a retained cybersecurity consultant, Consumer Plaintiffs began reviewing the documents produced by Arby's. (Declaration of Roy E. Barnes in Support of

Consumer Plaintiffs' Motion for Final Approval of Class Settlement [hereinafter "Barnes Dec."], attached as Exhibit 2, ¶ 7).

### C. Settlement Negotiations and Preliminary Approval

During the pendency of the motions to dismiss, the Parties began to discuss a possible resolution. (Barnes Dec., ¶ 13). After resolution of the first motion to dismiss, the Parties agreed to engage Ralph Levy, an experienced attorney[4] and mediator with JAMS Mediation in Atlanta.  On July 27, 2018, the Parties agreed in principle to the terms of a settlement and executed a non-binding term sheet.  (Barnes Dec., ¶ 14). The Parties did not discuss possible attorneys' fees, costs, and expenses until after they had agreed in principle to all other terms of the Settlement Agreement. (Barnes Dec., ¶ 24).  At a second mediation on August 10, 2018, the Parties reached an agreement in principle on attorneys' fees, costs, and expenses (Barnes Dec., ¶ 14). Subsequently, the Parties executed a Settlement Agreement and moved for and obtained its preliminary approval.  (*See* ECF Nos. 169, 175, No. 177).

---

[4] Mr. Levy practiced nearly 40 years with King & Spalding LLP.  While there, he was a senior litigation partner and served as the firm-wide managing partner for seven years.  *See* JAMS News, Jan. 11, 2012, *Veteran King & Spalding Lawyer Ralph B. Levy, Esq. joins JAMS in Atlanta*,  https://www.jamsadr.com/news/2012/v eteran-king-amp-spalding-lawyer-ralph-b-levy-esq-joins-jams-in-atlanta (last accessed Apr. 23, 2019).

## III.   THE SETTLEMENT

### A. The Settlement Class

The proposed Settlement Class includes all persons residing in the United States who used a debit or credit card to make a purchase at an affected Arby's restaurant during that restaurant's exposure window.[5]   The exposure windows relating to each affected Arby's restaurant range from October 8, 2016 to January 12, 2017.

### B. Settlement Benefits

#### 1.   Up to $2 Million in Settlement Funding

Under the terms of the Settlement Agreement, Arby's will fund up to $2 million for payment of the cost of benefits to Settlement Class Members. Specifically, Settlement Class Members who incurred a fraudulent charge on or a cancellation of their payment card subsequent to using that card at an Affected Location during its Exposure Window are eligible to receive reimbursement for

---

[5] Pursuant to the Settlement, "'Class' means all persons residing in the United States who used a debit or credit card to make a purchase at an Affected Location during its Exposure Window." (Settlement Agt. ¶ 1.8). The "Affected Locations" and their respective "Exposure Windows" are those listed in the public notification to consumers of the data breach posted by Arby's on April 14, 2017, at http://arbys.com/security ("Locations" tab). (*Id.*, ¶¶ 1.1, 1.13). Additionally, the Class specifically excludes: (i) Arby's and its officers and directors; and (ii) the Judge or Magistrate Judge to whom the action is assigned and, any member of those Judges' staffs or immediate family members. (Settlement Agt. ¶ 1.8).

documented, unreimbursed actual out-of-pocket expenses that were incurred as a result of the Security Incident and fall in one or more of the following categories:

- Costs and expenses spent addressing identity theft or fraud;

- Losses caused by restricted access to funds (i.e., costs of taking out a loan, ATM withdrawal fees);

- Preventative costs incurred from February 9, 2017 through the date of public announcement of the Settlement agreement, not to exceed $150.00 per Settlement Class Member, including cost of identity theft protection services, purchasing credit monitoring, placing security freezes on credit reports, or requesting copies of credit reports for review;

- Late fees, declined payment fees, overdraft fees, returned check fees, customer service fees, and/or card cancellation or replacement fees;

- Unauthorized charges on the credit or debit card that were not reimbursed; and

- Other documented losses that were not reimbursed.[6]

(Settlement Agt. ¶ 2.1.1). Additionally, those Settlement Class Members qualifying for expense reimbursement as set out above may make a claim for reimbursement of their time incurred by reason of the Data Breach as described.  Those with supporting documentation may submit a claim for up to five hours, at $15 per hour, to

---

[6] Documented losses included incidental charges such as costs associated with driving to banks or police stations to file reports, cell phone or data charges directly related to addressing the impacts of the breach, or hiring a service to assist in addressing identity theft.  *See* ECF No. 169-2, at 45.

compensate for time they spent remedying such impacts resulting from the Data Breach, and those who cannot document their time may self-certify the amount of time they spent remedying such impacts from the Data Breach, for up to two hours at $15 per hour. *Id.* at ¶¶ 2.1.1(a)-b).

Qualifying Settlement Class Members who submit valid claim forms and documentation will be eligible for reimbursement of expenses as described above, plus compensation for documented or undocumented time spent as described above, up to an aggregate maximum of $5,000. *Id.* at ¶ 2.1.1(c).

### 2. Identity Theft Protection Services

In addition to the foregoing, any Settlement Class Member who is not already enrolled in an identity theft protection service will be eligible to enroll without charge in an identity theft protection service provided by Experian Consumer Services ("Experian"), which provides periodic credit reports for review, credit report monitoring across all three credit bureaus, identity restoration assistance, and up to $1 million in identity theft insurance. Upon enrollment, coverage for these services shall be provided to the Settlement Class Member for a period of up to 24 months, provided that the aggregate amount fundable by Arby's for the identity theft protection service does not exceed $300,000, in which case the period of protection

provided by the identity theft protection service will be reduced to less than 24 months as necessary so as not to exceed that amount.

### 3. Data Security Practice Changes

Arby's has confirmed, under oath, that the following measures relating to consumer card security have been adopted and are currently in place:

- Arby's has designated a position within the company that is specifically responsible for overseeing information security compliance;

- Arby's has a written IT security policy addressing the security of its PCI DSS environment;

- Arby's has hired a third-party Qualified Security Assessor to conduct an annual penetration test of Arby's cardholder data environment that complies with the standards set forth by PCI DSS; and

- Arby's has implemented an annual security awareness training for its corporate and restaurant employees, which will include education and training regarding payment card data security and payment card data security best practices.

(Barnes Dec., ¶ 25).

### 4. Distribution Plan

Arby's shall fund payment of all approved claims for expense reimbursement and compensation for time spent, and the cost of all approved claims for the identity theft protection service, up to an aggregate amount of $2,000,000 (the "Aggregate Cap"). Within the "Aggregate Cap," Arby's has agreed to fund the cost of identity protection services up to $300,000 (the "Identity Theft Protection Sub-Cap").

(Settlement Agt. ¶2.1.2). In the event the aggregate amount of approved claims when added to the aggregate cost (after application of the Identity Theft Protection Sub-Cap) of the identity theft protection service exceeds the Aggregate Cap, the amount of each approved claim shall be reduced by a pro rata percentage such that Arby's liability to fund payments does not exceed the Aggregate Cap. If the total amount of funding required of Arby's under the Settlement Agreement is less than $2 million, Arby's shall retain any unfunded amount. (*Id.* ¶2.2.6).

Arby's has paid, and will continue to pay, the costs of providing Class notice and administering the Settlement benefits. KCC's estimated total costs for settlement administration will be approximately $291,000. (Peak Dec. ¶6). These costs are separate and apart from the up to $2 million in funding for the Settlement benefits. (Settlement Agt. ¶¶ 2.2.6, 2.3, 10.3).

## C. Notice

The Court approved the proposed notice plan to reach the proposed Class Members and appointed KCC Class Action Services, LLC to implement it. The Publication Notice appeared in one-third page ad units in the March 2019 edition of *Country Living* (on page 107) and the January 28, 2019 edition of *People* (on page 32) (Peak Dec., ¶ 7). The Publication Notice appeared in both the print publications and their online digital replicas. (*Id.).* As described in the Peak Declaration in

support of preliminary approval, *Country Living* has a circulation of 1,380,879, with approximately 11,934,000 readers.  It is a monthly home magazine covering design, food, pets, gardening, and how-to projects focusing on "small-town community" living.  *People* magazine, a weekly entertainment magazine, has a circulation of 3,411,860, with approximately 41,353,000 readers.  (*See* ECF 169-2, Pg. 65, 68-69).

KCC also published notice via 185,643,453 million internet banners on Facebook and the Google Display Network.  (Peak Dec., ¶ 10).  Facebook is the largest social media platform in terms of both audience size and engagement, providing the capability of reaching millions of users daily. The Google Display Network is an ad network that reaches over 90% of Internet users. It creates advertising opportunities to over two million websites, including some of the most-visited websites on the internet. As expected, the Notice Plan reached over 70% of likely Settlement Class Members an average of 1.6 times each via the consumer magazines and internet efforts alone.  (Peak Dec., ¶¶ 4.a; 19).

Additionally, Arby's posted a "Payment Card Notice" link on its website, www.Arbys.com, which directs users to the Settlement website. (Peak Dec., ¶ 14). Finally, KCC established a settlement website in the form agreed to by the parties and the Court. In addition to the notices, the website included information about the Settlement, related case documents, and the Settlement Agreement. (Settlement Agt.

¶ 4.2.3; Peak Dec., ¶ 12). Settlement Class Members have been able to submit claims electronically. (Peak Dec., ¶ 12).

### D. Attorneys' Fees, Costs and Expenses

Plaintiffs' Counsel are applying separately to the Court for an award of attorneys' fees, costs and expenses of up to $980,000 and reimbursement of costs and expenses of up to $35,000.  Arby's does not oppose either request. As with costs of notice and administration, Arby's has agreed to pay any attorneys' fees, costs and expenses awarded by the Court, up to the maximum amounts specified above, separate from the $2 million fundable for the cost of valid claims for benefits. (Settlement Agt. ¶ 8.2).

### E. Service Awards

Plaintiffs' Counsel will apply for, and Arby's has agreed not to oppose, service awards of up to $4,500 for each Representative Plaintiff[7] in recognition of their commitment to this case on behalf of the Settlement Class Members as set forth in the Settlement Agreement. (Settlement Agt. ¶ 8.3).

---

[7] Representative Plaintiffs are defined in Paragraph 1.21 of the Settlement Agreement.

**F. Release**

As part of the Settlement, the Parties have negotiated full mutual releases. (Settlement Agt. ¶7.2).

## IV.   THE SETTLEMENT MERITS FINAL APPROVAL

### A. Standard Governing Approval

Both "strong judicial policy" and an "overriding public interest favor settlements." *Meyer v. Citizens and Southern Nat'l Bank*, 677 F. Supp. 1196, 1200 (M.D. Ga. 1988) (citations and internal quotations omitted). Settlements are favored because they "conserve judicial resources by avoiding the expense of a complicated and protracted litigation process." *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). "Determining the fairness of the settlement is left to the sound discretion of the trial court." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). In exercising its discretion, "[t]he court is entitled to rely on the judgment of the parties in approving the proposal and should be hesitant to substitute its own judgment for that of counsel." *In re Motorsports*, 112 F. Supp. 2d at 1333.

Amended in December 2018, Rule 23(e)(2) of the Federal Rules of Civil Procedure requires the Court to determine whether a settlement is fair, adequate, reasonable, and not a product of collusion "by focusing on the primary procedural

considerations and substantive qualities that should always matter to the decision whether to approve the proposal." *See* Fed. R. Civ. P. 23, Advisory Comm. Notes to 2018 Amendments.  Specifically, the Court must consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;
>
> (C) the relief provided for the class is adequate, taking into account:
>
>> (i) the costs, risks, and delay of trial and appeal;
>>
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>
>> (iii) the terms of any proposed award of attorney's fees, including timing and payment; and
>>
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
>
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).  Paragraphs (A) and (B) "identify matters that might be described as 'procedural' concerns[,]" whereas Paragraphs (C) and (D) "focus on what might be called a 'substantive' review of the terms of the proposed settlement." Fed. R. Civ. P. 23, Advisory Comm. Notes to 2018 Amendments.  This framework tracks the Eleventh Circuit's traditional approach.  *See, e.g. Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1217 (11th Cir. 2012) (district court must make findings

that settlement "is not the product of collusion" and "that it is fair, reasonable and adequate").

Since the amendments, courts in this Circuit have used Rule 23(e)(2) to complement the traditional *Bennett* factors to decide whether a settlement is fair, reasonable, and adequate.  *See, e.g., Gumm v. Ford*, 5:15-CV-41-MTT, 2019 WL 479506, at *4 (M.D. Ga. Jan. 17, 2019) (discussing *Bennett* factors "[i]n addition to" new Rule 23(e)(2) standards); *Grant v. Ocwen Loan Servicing, LLC*, 315CV01376J34PDB, 2019 WL 367648, at *5 (M.D. Fla. Jan. 30, 2019) (applying Rule 23(e)(2) and *Bennett* factors in granting final approval). The *Bennett* factors include:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the anticipated complexity, expense, and duration of litigation; (5) the opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Gumm*, 2019 WL 479506, at *4. This Settlement merits approval under any standard.

## B. Procedural Considerations

### 1. The Class Representatives and Class Counsel have adequately represented the Class.

Rule 23(e)(2)(A) addresses whether class representatives and class counsel have adequately represented the interests of the Settlement Class.  Courts have examined this issue with a "two-part test: (1) whether plaintiffs have interests

15

antagonistic to the interests of other class members; and (2) whether the proposed class' counsel has the necessary qualifications and experience to lead the litigation." *Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 555 (N.D. Ga. 2007).

The five class representatives in this case do not have interests antagonistic from other Settlement Class Members. Each of them were impacted by using a credit or debit card at an Arby's restaurant identified pursuant to the Settlement Agreement during the Exposure Window.[8] The proposed representatives need not be identical to all class members; for instance, "[t]he fact that the named plaintiffs may have suffered greater damages does not indicate that named plaintiffs possess interests antagonistic to other plaintiffs." *Id.*

Further, each class representative worked diligently with their counsel to prepare and file complaints, produce documents related to the breach, respond to written discovery, and otherwise assist in the prosecution of this litigation. *See* Barnes Dec. ¶¶ 37-38; *c.f. Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 728

---

[8] In the Consolidated Amended Complaint, Plaintiff Rutters alleged that he made purchases at an Arby's restaurant located at 2600 S. Orange Avenue, Orlando, Florida 32806 (store number 5927) on October 27, 2016 and January 14, 2017. (*Id.* ¶41). The exposure window for this location was November 17, 2016 through January 12, 2017. During the course of discovery, the Parties confirmed via bank records that Plaintiff Rutters made another purchase at this location inside its exposure window on December 22, 2017.

(11th Cir. 1987) ("[C]lass certification should not be denied … unless [class representatives'] participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case"). Their participation, coupled with the experience of their counsel, ensured adequate representation of the absent class members' interests.[9]

### 2.  The Proposed Settlement was Negotiated at Arm's Length.

Rule 23(e)(2)(B) requires an inquiry into whether the settlement was a result of arm's length negotiations.  *Id.*; *see also In re Motorsports*, 112 F. Supp. 2d at 1333 (equating arms' length negotiations with being "free of fraud or collusion"). "The conclusion that the parties did not collude in arriving at a settlement involves a negative analysis: whether there is any reason to believe otherwise."  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 313–14 (N.D. Ga. 1993) (reviewing history of protracted, often contentious settlement negotiations and finding "no indicia of fraud or collusion in the negotiation or drafting of the settlements").  In other words, "[t]here is a presumption of good faith in the negotiation process." *Wilson v. EverBank*, No. 14-CIV-22264, 2016 WL 457011, at *6 (S.D. Fla. Feb. 3, 2016).  This presumption is further bolstered when, as here, the

---

[9] The experience and qualifications of Settlement Class Counsel have previously been provided to the Court. *See* ECF 45.

parties use an experienced mediator to help broker a settlement agreement. *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to the absence of collusion.").

This Court's docket is an indicator of how protracted and vigorously contested this case has been. The Parties only mediated with Mr. Levy after the case proceeded past the motion to dismiss stage. After an all-day mediation session, Mr. Levy was able to assist in guiding the Parties past their disagreements to a Settlement Agreement which provides Settlement Class Members with tangible, substantial benefits, while avoiding the risks and uncertainty associated with continuing litigation. (Barnes Dec., ¶¶ 14, 16). Further demonstrating the lack of collusion, the Parties did not discuss the amount of attorneys' fees, costs and expenses until after the Parties agreed upon the relief to the Settlement Class. (Barnes Dec, ¶ 24). Indeed, the Parties negotiated the amount of attorneys' fees, costs and expenses in a separate mediation session with Mr. Levy. (Barnes Dec., ¶ 24). In sum, the Settlement Agreement was not the result of collusion or bad faith, and was negotiated at arm's length between adverse parties, each with their own clients' best interests in mind.

### C. The Settlement is Fair, Reasonable, and Adequate

### 1. The Settlement Agreement Provides Substantial Relief to the Class.[10]

Rule 23(e)(2)(C) requires that the substance of the settlement agreement provides adequate relief to the class. *Id.*; *cf. In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, 1:14-MD-02583-TWT, 2016 WL 6902351, at *6 (N.D. Ga. Aug. 23, 2016) (examining second and third *Bennett* factors as to whether settlement falls within the range of possible recoveries and is fair, adequate and reasonable). "The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the proposed settlement in its totality." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. Dec. 20, 2005).

The relief provided here compares favorably with those of other settlements in data breach class actions. *See generally In re the Home Depot,* 2016 WL 6902351, at *5. For instance, the Target data breach compromised the personal information of "nearly 100 million American consumers." *In re Target Corp. Customer Data Sec. Breach Litig.*, MDL 14-2522 (PAM), 2017 WL 2178306, at *1 (D. Minn. May 17, 2017), *aff'd,* 892 F.3d 968 (8th Cir. 2018). There, Target agreed to pay a fund of $10 million to, among other things, reimburse consumers for all of their

---

[10] This factor has four points of analysis, including the amount, timing, and payment of attorneys' fees. Class Counsel will address this factor in an application for attorneys' fees, filed concurrently with this brief.

documented losses up to $10,000. *Id.* The district court reasoned that "[a]ll class members' fears of future harm are remedied both by the compensation available for purchase of credit-monitoring/identity-theft protection and by the steps Target agreed to take to secure its customers' data in the future." *See also In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.*, 851 F. Supp. 2d 1040, 1048-1069 (S.D. Tex. 2012) (approving settlement that provided up to $2.4 million to pay for out-of-pocket losses but no monitoring services); *see Bray v. GameStop Corp.*, No. 1:17-cv-01365-JEJ (D. Del.), Mot. for Preliminary Approval (ECF No. 41, at 3) (discussing confirmatory discovery taken to verify post-breach security measures) (final approval granted on December 19, 2018) (ECF No. 54).

Additionally, the *Wendy's* data breach settlement provides a useful comparison. *See generally Jackson et al v. Wendy's International, LLC*, No. 6:16-cv-21-PGB-DCI (M.D. Fl.) (ECF No. 157) (final approval granted Feb. 26, 2019). In that settlement, Wendy's agreed to pay up to $3.4 million to settle claims, including reimbursement for documented losses up to $5,000. *Id.*, Mot. for Final Approval (ECF No. 152). Similar to the present settlement, Wendy's provided compensation for time spent dealing with the impacts of the breach, up to five hours, at $15 per hour, with supporting documentation and up to two hours at $15 per hour for self-certification of time. *Id.* One important difference is that this settlement

provides a benefit lacking in *Wendy's*: qualifying Settlement Class Members have the option to enroll in identity theft protection services for up to 24 months.

Bolstering the conclusion of fairness and reasonableness is the fact that no Settlement Class Members either objected to or opted out of the Settlement. *See Hamilton v. SunTrust Mortg. Inc.*, No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (absence of objections and opt-outs reflects "overwhelming support for the settlement and evidence of its reasonableness and fairness"); *see also George v. Acad. Mortgage Corp. (UT)*, 1:16-CV-00471-CAP, 2019 WL 1324023, at *10 (N.D. Ga. Mar. 20, 2019) ("The lack of opposition to the Settlement clearly supports final approval.").

> a. *Continued litigation would be complex, expensive, and lengthy, and the benefits outweigh the uncertainty of success at trial.*

Courts must weigh the costs, risks, and delay of trial and appeal against the certainty and immediacy of relief afforded by settlement. Fed. R. Civ. P. 23(e)(2)(C)(i); *see also Home Depot*, 2016 WL 6902351, at *5 (balancing settlement benefits against risks inherent in data breach class actions).

Although Plaintiffs are confident in the merits of their claims, the risks involved in prosecuting a class action through trial cannot be disregarded. Arby's denies any liability for Plaintiffs' claims. Although the Court largely denied Arby's

two motions to dismiss, Arby's would surely continue to argue that there is no duty to safeguard personal information under Georgia law. *See generally McConnell v. Georgia Dep't of Labor*, 345 Ga. App. 669, 678 (2018), *cert. granted* (Nov. 15, 2018). Arby's would, of course, dispute whether it breached such a duty. And assuming the Plaintiffs and Settlement Class Members could prove causation, proving damages is no sure thing, as Georgia case law "suggest[s] that the fact of compromised data is not a compensable injury by itself in the absence of some 'loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty[.]'" *Collins v. Athens Orthopedic Clinic*, 347 Ga. App. 13, 16 (2018) (physical precedent only), *cert. granted* (April 29, 2019).

Beyond the merits, class certification is challenging in any case. As Arby's repeatedly argued, there is a paucity of data breach cases where certification of a consumer class outside the settlement context has been granted. *See, e.g., In re Hannaford Bros. Co. Customer Data Security Breach Litig.*, 293 F.R.D. 21, 33 (D. Me. 2013). Throughout, Plaintiffs would need to engage in substantial additional fact and expert discovery, and Plaintiffs would need to combat additional dispositive motions before trial. Even supposing Plaintiffs achieved certification with their claims intact, "the trial process is always fraught with uncertainty." *Home Depot, Inc.*, 2016 WL 6902351, at *5 (quoting *In re Motorsports*, 112 F. Supp. 2d at 1334).

And any successful trial would inevitably require a significant investment of time and resources on appeal, all without the guarantee of any relief.

A "[s]ettlement [that] will alleviate the need for judicial exploration of . . . complex subjects, reduce litigation costs, and eliminate the significant risk that individual claimants might recover nothing" merits preliminary approval. *Lipuma*, 406 F. Supp. 2d at 1324. Such is the case here, as the Settlement provides the Settlement Class Members with guaranteed and immediate recovery, weighing in favor of final approval. *See Columbus Drywall*, 258 F.R.D. at 559-560 ("Plaintiffs [would] not have any guarantee that they will receive a larger recovery from the Settling Defendants were they to forego the settlement offer").

Plaintiffs were also at a stage in the litigation where they could effectively weight the benefits of the Settlement against the risks of continued litigation. *See Lipuma*, 406 F. Supp. 2d at 1324 (noting this *Bennett* factor "ensure[s] that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation."). Before filing the Consolidated Complaint, Plaintiffs' Counsel devoted significant time to investigate the facts related to the Data Breach and to research possible claims. After filing the Complaint, Plaintiffs' Counsel opposed two motions to dismiss. The Parties had engaged in protracted negotiations and argument over the scope and length of

discovery. At the time of settlement, the Parties had exchanged interrogatory responses, and Arby's had begun producing a substantial number of documents. This work, combined with their experience in successfully prosecuting similar data breach cases, gave Plaintiffs' Counsel the opportunity to sufficiently evaluate the merits of the case and weigh the potential relief. *See id.* ("Certainly, courts favor early settlement... [V]ast formal discovery need not be taken[.] we have often seen cases which were 'over discovered.'").

> b. *The proposed method of processing claims and distributing relief is effective.*

Rule 23(e)(2)(C)(ii) requires a showing of the effectiveness of the proposed method of distributing relief to the class (i.e., the Settlement's "allocation" or "distribution"), including the method of processing individual claims (i.e., the claims process). *Id.*

With respect to the distribution plan, each Settlement Class Member is eligible to receive reimbursement for expenses incurred as a result of and time spent remedying the impacts of the breach up to an aggregate amount of $5,000.00. Should the claims exceed the Settlement's $2 million cap, (which the Parties do not anticipate), eligible claims would be reduced on a pro rata basis. (Settlement Agt. ¶ 2.2.6). Additionally, the class members will be eligible to enroll in identity theft

protection services for up to 24 months.  Thus, the distribution plan ensures that all Settlement Class Members will be compensated for their injuries from the breach and receive protection going forward.

Next, the claims process "provides an effective method of implementing that plan by ensuring that the claimant provides sufficient information to calculate the recognized loss amount." *Hefler v. Wells Fargo & Co.*, 16-CV-05479-JST, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018), *appeal docketed* (9th Cir. Jan. 28, 2019). To ensure a professional, user-friendly process, the Parties retained KCC, an industry leader in class administration.  Each claimant must provide information sufficient for KCC to determine whether he or she made a purchase at a compromised restaurant during the exposure window as a threshold determination. Claimants who suffered out-of-pocket losses must provide additional documentation to substantiate those losses. Any claimant submitting insufficient claims will receive a request for additional information, along with instructions on how to cure the deficiency.  (Peak Dec. ¶17). These are fair procedures to ensure that claims are legitimate while not being so onerous as to become a detailed audit for claimants. As a result, KCC's estimated total costs for settlement administration will be approximately $291,000, a significant investment for the benefit of the Class.  (Peak Dec. ¶6). This factor weighs in favor of approval.

> c. *There are no agreements required to be identified under Rule 23(e)(3).*

The Parties have not entered into any agreements required to be identified under Rule 23(e)(3).  This factor weighs in favor of approval.  *See Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *5 (Dec. 16, 2018), *appeal docketed* (7th Cir. Jan. 14, 2019).

### 2.  The Settlement treats class members equitably relative to each other.

Rule 23(e)(2)(D) considers whether a settlement treats class members equitably relative to each other. A court may consider whether "the apportionment of relief among class members takes appropriate account of differences of their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23, Advisory Comm. Notes to 2018 Amendments.  Differences in the amount of relief each class member is entitled to are permissible, provided the relief itself is allocated "commensurate to the value of [each class member's] respective [] claims."  *Swinton v. SquareTrade, Inc.*, Case No. 4:18-cv-00144-SMR-SBJ, 2019 WL 617791, at *8 (S.D. Iowa Feb. 14, 2019).  This factor weighs in favor of approval because the only substantive difference in relief among Settlement Class Members relates to the amount of out-of-pocket damages each suffered and the time they spent remedying the breach. Those class members who suffered more are compensated more.  Since each class

member is compensated proportionally to his or her loss, this factor too supports final approval.

**B.     The Court Should Confirm Certification of the Settlement Class**

Plaintiffs request that the Court confirm the certification of the Settlement Class pursuant to Rule 23.  When "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial," but the Court still must ensure satisfaction with other Rule 23 requirements. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).  The Settlement Class satisfies each of the requirements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and Rule 23(b)(3) (predominance and superiority).

**1.  Each Criteria for Class Certification under Rule 23(a) is Satisfied**

*a. Numerosity*

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class," not "that joinder is impossible." *Columbus Drywall*, 258 F.R.D. at 554. Further, courts require only that plaintiffs provide "some evidence of the number of

members in the purported class, or at least a reasonable estimate of that number."
*Leszczynski v. Allianz Insurance*, 176 F.R.D. 659, 669 (S.D. Fla. 1997). Through
discovery, Plaintiffs learned that the Settlement Class consists of several million
U.S. Arby's customers whose Payment Card Data may have been exposed.
Numerosity for purposes of a certifying a class for settlement is easily satisfied.

### b. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the
class." *Id*. "Commonality requires the plaintiff to demonstrate that the class members
'have suffered the same injury,'" such that "all their claims can productively be
litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-350 (2011).
"[C]ommonality requires 'that there be at least one issue whose resolution will affect
all or a significant number of the putative class members.'" *Williams v. Mohawk
Industries, Inc*., 568 F.3d 1350, 1355 (11th Cir. 2009) (quoting *Stewart v. Winter*,
669 F.2d 328, 335 (5th Cir.1982)). Thus, the commonality element is generally
satisfied where, as here "a plaintiff alleges that defendants have engaged in a
standardized course of conduct that affects all class members." *Terrill v. Electrolux
Home Products, Inc*., 295 F.R.D. 671, 685 (S.D. Ga. 2013) (internal quotations
omitted).

Like other data breach cases, this case has a number of common questions of law and fact, including: (1) whether Arby's failed to adequately protect Settlement Class Members' Payment Card Data; (2) whether Arby's conduct constituted unfair methods of competition and unfair, deceptive, or unlawful acts actionable under the GFBPA; (3) whether Arby's had a legal duty to adequately protect Settlement Class Members' Payment Card Data; (4) whether Arby's breached that legal duty; and (5) whether Arby's knew or should have known that Payment Card Data was vulnerable to attack. "These common issues all center on [Arby's] conduct, satisfying the commonality requirement." *Home Depot,* 2016 WL 6902351, at *2.

### c. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." *Id.*  This requirement is readily satisfied in data breach cases such as this one.  Plaintiffs' claims are typical of those of the Settlement Class because they arise from the same Data Breach, and because they are also based on the same legal theory that Arby's failed to protect Payment Card Data. *See Home Depot*, 2016 WL 6902351, at *2.

### d. Adequacy of Representation

*See* Part IV.A.1.a, *supra*.

### 2.  The Class Satisfies the Requirements of Rule 23(b)(3)

#### a.  Predominance

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Terrill*, 295 F.R.D. at 688. Here, as in previous data breach cases, common questions of fact and law described above predominate over any individualized issues for purposes of settlement. *See, e.g., Home Depot,* 2016 WL 6902351, at *2*; In re Countrywide*, 2009 WL 5184352, at *6-7; *In re Heartland Payment Systems.*, 851 F. Supp. 2d at 1059.

#### b.  Superiority

Because of the common issues that predominate in this case, a class action is superior to other methods for adjudicating these claims. *See In re Anthem, Inc. Data Breach Litigation*, 15-MD-02617-LHK, 2018 WL 3872788, at *11 (N.D. Cal. Aug. 15, 2018) (citing *Home Depot* and *Target*). Judicial economy is best served for purposes of settlement by resolving Plaintiffs' claims as a class. See *Terrill*, 295 F.R.D. at 697 ("A single, coordinated proceeding is superior to hundreds of discrete and disjointed suits addressing the same facts and legal issues.").

## C.     Notice to the Settlement Class Complied with Due Process.

Rule 23(e)(1)(B) requires that the court direct notice in a reasonable manner to all class members who would be bound by the proposal. *Id.* "The notice should be 'reasonably calculated, under all the circumstances, to appraise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 691 (S.D. Fla. 2014).  The notice program utilized here, as set by the Court's November 30, 2018 Order (ECF No. 177, at 6-7), meets this standard. *See* Fed. Judicial Center, *Judges' Class Action Notice and Claims Process Checklist* 1 (2010) (describing 70-95% as a "high percentage" of class members reached for effective notice); Fed. Judicial Center, *Managing Class Action Litig.*: A Pocket Guide for Judges 27 (3d ed. 2010) (same).

The Notice describes the Settlement terms, legal claims at issue, releases, claims submission, objections, and opt-out processes, and all relevant deadlines in plain language.  *See* Part III.C., *supra*.  KCC established a telephone call center and a website to assist potential Settlement Class Members with the Settlement and claims process.  (Peak Dec. ¶12-13).  The Plaintiffs have satisfied all the elements of the notice plan as approved by the Court.

## V.    CONCLUSION

For the reasons stated herein and in the Lead Counsel Declaration, Plaintiffs respectfully request that the Court: (1) grant final approval of the proposed class action settlement between the Parties; (2) finally certify the Settlement Class pursuant to Federal Rules of Civil Procedure 23(b)(3) and (3) enter a final judgment in this action. A proposed order is attached for the Court's consideration.

Dated: May 7, 2019                                  Respectfully Submitted,

| /s/ J. Cameron Tribble | /s/ Timothy J. Peter |
|---|---|
| **BARNES LAW GROUP, LLC** | **FARUQI & FARUQI, LLP** |
| Roy E. Barnes | Robert W. Killorin |
| Ga. Bar No. 039000 | Ga. Bar No. 417775 |
| John R. Bevis | Stuart J. Guber |
| Ga. Bar No. 056100 | Ga. Bar No. 141879 |
| J. Cameron Tribble | Timothy J. Peter * |
| Ga. Bar No. 754759 | 101 Greenwood Avenue |
| 31 Atlanta Street | Jenkintown, Pennsylvania 19046 |
| Marietta, Georgia 30060 | Tel:  (215) 277-5770 |
| Tel: (770) 227-6375 | Fax:  (215) 277-5771 |
| Fax: (770) 227-6373 | rkillorin@faruqilaw.com |
| roy@barneslawgroup.com | sguber@faruqilaw.com |
| bevis@barneslawgroup.com | tpeter@faruqilaw.com |
| ctribble@barneslawgroup.com | |

*Co-Lead Counsel
for Plaintiffs and the Proposed Class
*Pro Hac Vice*

**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
John Yanchunis *
Marisa Glassman*
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Tel: (813) 223-5505
Fax: (813) 223-5402
jyanchunis@forthepeople.com
mglassman@forthepeople.com

**EVANGELISTA WORLEY, LLC**
David J. Worley
Ga. Bar No. 776665
James M. Evangelista
Ga. Bar No. 707807
8100A Roswell Road, Suite 100
Atlanta, Georgia 30350
Tel: (404) 205-8400
Fax: (404) 205-8395
jim@ewlawllc.com
david@ewlawllc.com

*Co-Liaison Counsel*
*for Plaintiffs and the Proposed Class*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel certifies that the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS** was prepared in Times New Roman, 14-point font, in accordance with Local Rule 5.1(C).

This 7th day of May, 2019.


*/s/ J. Cameron Tribble*_____
J. Cameron Tribble

*Co-Liaison Counsel*
*for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that today I electronically filed the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND CERTIFICATION OF SETTLEMENT CLASS** with the Clerk of Court using the CM/ECF system, which will automatically send email notification to all counsel of record.

This 7th day of May, 2019.

BARNES LAW GROUP, LLC

*/s/ J. Cameron Tribble*_____
J. Cameron Tribble
Ga. Bar No. 754759
31 Atlanta Street
Marietta, Georgia 30060
Tel: (770) 227-6375
Fax: (770) 227-6373
ctribble@barneslawgroup.com